## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

SHAHRIAR "JAMES" EKBATANI;
SHAHRZAD EKBATANI, as TRUSTEE FOR
NOBILITY TRUST AND DIGNITY TRUST;
and TERRENCE DIAZ,

      Plaintiffs,

vs.

COMMUNITY CARE HEALTH NETWORK,
LLC d/b/a MATRIX MEDICAL NETWORK;
FRAZIER MANAGEMENT LLC d/b/a
FRAZIER HEALTHCARE PARTNERS;
FRAZIER HEALTHCARE VENTURES;
FRAZIER HEALTHCARE VII, L.P.;
FRAZIER HEALTHCARE VII-A, L.P.;
FRAZIER HEALTHCARE GROWTH
BUYOUT FUND VIII, L.P.; FRAZIER
HEALTHCARE GROWTH BUYOUT
AFFILIATES VIII, L.P.; and THE
PROVIDENCE SERVICE CORPORATION,
a Delaware corporation,

      Defendants.

Case No.: _____

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Shahriar "James" Ekbatani ("Ekbatani"), Shahrzad Ekbatani, as Trustee

for Nobility Trust and Dignity Trust, and Terrence Diaz ("Diaz") (collectively,

"Plaintiffs"), for their Complaint and Demand for Jury Trial against Community Care

Health Network, LLC d/b/a Matrix Medical Network ("Matrix"), Frazier Management,

LLC d/b/a Frazier Healthcare Partners, Frazier Healthcare Ventures, Frazier Healthcare

VII, L.P., Frazier Healthcare VII-A, L.P., Frazier Healthcare Growth Buyout Fund VIII,

L.P., Frazier Healthcare Growth Buyout Affiliates VIII, L.P., and The Providence Service

Corporation ("Providence") (collectively, "Defendants"), allege as follows:

## NATURE OF THE ACTION

1.      This is an action stemming from Defendants' acquisition of DPN USA, LLC d/b/a HealthFair (the "Acquisition"), in violation of Section 7 of the Clayton Act. Prior to the Acquisition, Matrix and HealthFair were direct competitors in the market for healthcare risk adjustment services.  Rather than combining these two firms to better compete in the relevant market, as Plaintiffs anticipated when they agreed to sell HealthFair, Defendants used the Acquisition to control and suppress an innovative competitor and substantially reduce competition in the market for the provision of risk adjustment services in Florida.  Defendants should be held accountable for its anticompetitive scheme, which has caused harm to healthcare payors and insureds in Florida and to the Plaintiffs in this action.

2.      The modern American healthcare system has pivoted from fee-for-service reimbursement for healthcare payors (*i.e.*, health insurance plans and risk-bearing providers) that provide services under Medicare and the Affordable Care Act in favor of a structure that reimburses payors prospectively based on a review of the patients' underlying health status and the anticipated health spending for those patients.  This newer structure is founded upon risk adjustment, or adjusting payments to payors based on how sick the payors' enrollment population is assessed to be (*i.e.*, how much risk the payor has that it will have to pay a higher cost for patient healthcare than the average cost in any given geographic area).  Thus, payors that disproportionately enroll healthy beneficiaries will be paid less than they would have been if they had enrolled

2

beneficiaries with the average risk profile, while payors that disproportionately enroll the sickest patients will be paid more.

3. The healthcare risk adjustment services industry emerged in response to the reimbursement structure premised on risk adjustment. Risk adjustment service providers often serve as a one-stop shop for payors, whereby the payors retain the risk adjustment service provider to assess the payors' enrolled population for existing health conditions that may lead to increased utilization of healthcare services and a corresponding cost increase to the health plan. Prior to the emergence of companies that exclusively perform risk adjustment services, payors were dependent upon a broad web of providers (from primary care physicians to hospitals) to catch and properly code patients' existing conditions. If the patients had underlying conditions, but failed to schedule an annual visit with their providers, the payor would be reimbursed at a lower rate for these patients because these patients would appear healthy on paper (as there were no diagnoses coded for those patients). Yet, as a consequence of his or her existing conditions, the patient would utilize a greater number of healthcare services, and the plan would incur costs similar to those of a sick patient.

4. Risk adjustment companies such as HealthFair and Matrix partner with payors to ensure that patient populations who were at risk of not seeing their physicians, or otherwise not obtaining clinical validation of existing conditions, were seen, assessed, treated, and properly documented. A risk adjustment company's value lies in accurately capturing as many underlying health conditions as it can for each patient—the more underlying conditions that a risk adjustment company is able to document for a payor's

member population, the greater the risk adjustment factor and greater the reimbursement the payor receives per member from governmental entities such as the Centers for Medicare & Medicaid Services ("CMS") or the Department of Health and Human Services ("HHS"). This process ensures that payors are made whole and do not sustain unanticipated costs to care for their sick enrollees.

5.      Matrix is an incumbent provider of risk adjustment services. Matrix and the other incumbent firms maintain a business model that provides risk assessments conducted at the home of the patient. In 2014, HealthFair entered into and immediately disrupted the market with its innovative, technology-forward business model that provided assessments in mobile clinics it deployed to patients' communities at strategic intervals. This business model caught on quickly; by 2017, HealthFair was experiencing double-digit, year-over-year growth. This growth caught Matrix's attention, in part because HealthFair beat out Matrix and was awarded business over Matrix from at least one of Matrix's longstanding payor-customers.

6.      At the time of the Acquisition, HealthFair was owned by Ekbatani, Shahrzad Ekbatani (as trustee of the Nobility Trust and Dignity Trust), Terrence Diaz, and Jerry Cox (collectively, "Sellers"). Due to HealthFair's explosive growth, Sellers began looking for a purchaser that had sufficient capital to invest in HealthFair, allowing it to achieve its full potential. During a competitive bidding process, Defendants pitched Matrix to Sellers as the right partner to achieve this vision. In particular, Defendants assured Sellers that Matrix had the desire and the ability to continue to grow and expand HealthFair's mobile services and, through the Acquisition, Defendants would provide the

capital necessary to continue HealthFair's growth trajectory, thereby enhancing competition for risk adjustment services by growing the scope and footprint of HealthFair's offerings.

7.     In January 2018, Sellers, including Ekbatani, Shahrzad Ekbatani, and Diaz, sold their equity interests in HealthFair to Matrix for $160 million in combined cash and rollover shares, as well as the condition that the owners would be entitled to a contingent payment based on certain HealthFair performance benchmarks over the course of the year following the Acquisition.

8.     Following the Acquisition, Ekbatani and Diaz, who had developed and refined the business and operation model driving HealthFair's exceptional success, stayed on with HealthFair to help guide the company forward and continue the growth trajectory.  Despite warnings from Ekbatani and Diaz, Defendants immediately instituted changes at HealthFair that undermined its success.  Within months, Ekbatani and Diaz—as well as other key, veteran HealthFair employees—were asked to leave HealthFair or were otherwise terminated.  Defendants then reduced the number of patients HealthFair saw in 2018 by at least 20 percent—since 2018, Defendants have further reduced HealthFair's mobile operations.

9.     After significantly reducing HealthFair's mobile operations, Defendants successfully increased Matrix's prices for its in-home offerings.

10.     Defendants' efforts to lessen competition by suppressing HealthFair's mobile operations were anticompetitive and improper.  Defendants suppressed HealthFair's innovative mobile risk adjustment operations in order to maximize

Defendants' profits from Matrix's pre-existing in-home offerings.  By taking steps to eliminate HealthFair from the market, Defendants effectively withdrew mobile risk adjustment services as a substitute for Matrix's in-home offerings.  They did so to impede growth in mobile offerings, which payors were increasingly choosing as a superior substitute for Matrix's in-home services.  Defendants knew that, once HealthFair was removed from the market, another competitor with mobile offerings—particularly mobile offerings on a scale that would pose a threat to Matrix's business model—was unlikely to emerge, including because of formidable barriers to entry in the relevant market.

11.    Defendants' actions have had the effect of substantially lessening competition in the market for risk adjustment services in Florida—in violation of Section 7 of the Clayton Act.  Defendants have effectively eliminated a once formidable and growing competitor in the market for risk adjustment services in Florida, as well as a substitute product (mobile risk adjustment services) for Matrix's in-home risk adjustment services.  By acquiring HealthFair and subsequently suppressing output from the mobile side, Matrix diminished innovation in the relevant market.

12.    In so doing, Defendants have harmed consumers of risk adjustment services (the payors), insureds, and Plaintiffs.  HealthFair provided a range of diagnostic services that increased risk adjustment capabilities, which captured more accurately the risk profile of the patients enrolled by HealthFair's customers.  Consequently, HealthFair's customers were able to seek reimbursement from CMS based on accurate risk adjustments, reducing the likelihood that the customer's bid to CMS would exceed the benchmark.  This is important because, if the bid exceeds the benchmark, the payor

must charge each plan member a premium to cover the difference.  When Defendants deprived payors of HealthFair's broader mobile services, payors were left with at-home assessments, which do not capture the same level of risk as do the mobile assessments. As a result, payors were ultimately left with a less accurate risk adjustment, increasing the likelihood that the payor's bid to CMS would exceed the benchmark, thereby lessening the payments the payor receives from CMS (harming the payors), and triggering additional premium obligations from the payor's insureds (harming the insureds).  Plaintiffs also have been directly harmed by Defendants' anticompetitive conduct; by eliminating an innovative competitor and suppressing HealthFair's output, Defendants deprived Plaintiffs of payments that were inextricably tied to the harm Defendants inflicted on competition.  Faced with the prospect that Defendants would continue to erode competition, Plaintiffs bring this suit to rectify and redress these harms.

## PARTIES

13.     Plaintiff Ekbatani resides in Orange County, Florida and is a citizen of Florida.

14.     Plaintiff Shahrzad Ekbatani resides in Miami Dade County, Florida and is a citizen of Florida.

15.     Plaintiff Terrence Diaz resides in Hillsborough County, Florida and is a citizen of Florida.

16.     Defendant Matrix is a Delaware limited liability company with its principal place of business in Scottsdale, Arizona.

17.     Defendant The Providence Service Corporation is a Delaware corporation

with its principal place of business in Atlanta, Georgia.

18.     Defendant Frazier Management, LLC d/b/a Frazier Healthcare Partners ("Frazier") is a Delaware limited liability company with its principal place of business in Seattle, Washington.

19.     Defendants Frazier Healthcare Ventures, Frazier Healthcare VII, L.P., Frazier Healthcare VII-A, L.P., Frazier Healthcare Growth Buyout Fund VIII, L.P., and Frazier Healthcare Growth Buyout Affiliates VIII, L.P. are Delaware limited partnerships, each with a principal place of business in Seattle, Washington.

20.     Defendants Frazier Management, LLC, Frazier Healthcare Ventures, Frazier Healthcare VII, L.P., Frazier Healthcare VII-A, L.P., Frazier Healthcare Growth Buyout Fund VIII, L.P., and Frazier Healthcare Growth Buyout Affiliates VIII, L.P. are referred to hereinafter as the "Frazier Entities."

21.     Matrix is indirectly owned by Providence and the Frazier Entities.  Prior to 2016, Matrix was a wholly owned subsidiary of Providence; in 2016, the Frazier Entities acquired a majority and controlling interest in Matrix.[1]

## JURISDICTION AND VENUE

22.     This Court has subject-matter jurisdiction over this suit under 28 U.S.C. §§ 1331 and 1337(a).

23.     The Court has personal jurisdiction over Matrix pursuant to 15 U.S.C. § 22 and/or Florida Statute § 48.193.  Matrix maintains a number of operations in Florida

---

[1]     Providence Service Corporation, SEC Filings, Providence Form 10-K, (Feb. 27, 2020), https://investor.prscholdings.com/financial-information/sec-filings?field_nir_sec_form_group_target_id%5B%5D=471&field_nir_sec_date_filed_value=&items_per_page=10#views-exposed-form-widget-sec-filings-table.

and in this District.  Matrix operates a regional office in Clearwater, Florida.  Matrix also maintains an office in Largo, Florida, where Matrix's call center operations for its nationwide operations are located.  Additionally, Matrix conducts substantial business operations in Florida by providing risk-adjustment services to its clients that serve a population residing in Florida and in this District, and Matrix derives significant revenue from these Florida operations.

24.     The Court has personal jurisdiction over Providence pursuant to 15 U.S.C. § 22 and/or Florida Statute § 48.193.   Providence conducts substantial business operations in Florida.   Providence describes itself as "the largest manager of non-emergency medical transportation ('NET') programs for state governments and managed care organizations ('MCOs') in the United States ('U.S.'), primarily through its brands LogistiCare and Circulation."[2]  Providence reports that its NET Services "provided non-emergency transportation solutions to clients, including health systems, in 50 states and the District of Columbia[,]" and NET Services "accounts for substantially all of our consolidated revenue."[3]   Thus, Providence conducts substantial business operations in Florida and derives significant revenue from its Florida operations.

25.     The Court has specific personal jurisdiction over the Frazier Entities pursuant to Florida Statute § 48.193.  The claim alleged herein arises from the Frazier Entities' forum-related contacts in Florida.  As alleged more fully in Paragraph Nos. 26 to 37, the Frazier Entities operated, conducted, engaged in, or carried on a business venture in Florida, and the Frazier Entities committed a tortious act within the state of Florida.

---

[2] *Id.* at 4.

[3] *Id.* at 6.

26.     For the reasons set forth below in Paragraph Nos. 26 to 37, Defendants Frazier Healthcare Ventures, Frazier Healthcare VII, L.P., Frazier Healthcare VII-A, L.P., Frazier Healthcare Growth Buyout Fund VIII, L.P., and Frazier Healthcare Growth Buyout Affiliates VIII, L.P. are the agents or alter egos of Defendant Frazier Management, LLC and are subject to Frazier Management, LLC's operational control and/or are mere instrumentalities of Frazier Management, LLC.  As a result, the Frazier Entities' contacts with Florida may be imputed to Frazier Management, LLC.

27.     The Frazier Entities collectively operate in the United States under the name "Frazier Healthcare Partners."  [https://www.frazierhealthcare.com/growth-buyout/team]  The Frazier Healthcare Partners website lists several key individuals as core team members: Brett Moraski is Frazier's Executive in Residence; Steve Tallman is Frazier's Partner, Finance & Operations; Ben Magnano is Frazier's Managing Partner; Dr. Nathan Every is Frazier's General Partner; Brian Morfitt is Frazier's General Partner; and Kent Berkley is a Principal at Frazier.

28.     In a January 4, 2018 commitment letter related to the Acquisition, Frazier Healthcare VII, L.P., Frazier Healthcare VII-A, L.P., Frazier Healthcare Growth Buyout Fund VIII, L.P., and Frazier Healthcare Growth Buyout Affiliates VIII, L.P. are all listed as investors in Mercury Parent, LLC, Matrix's indirect parent company.  Magnano executed the letter agreement on behalf of all of the Frazier Entities.

29.     As more fully described below, in all communications and correspondence with Sellers, the Frazier Entities were identified simply as "Frazier" or "Frazier Healthcare Partners."  From communications with key Frazier representatives, Plaintiffs

understood that they were dealing with Frazier Healthcare Partners as a whole rather than distinct corporate entities within Frazier.

30.     By virtue of the Acquisition at issue in this litigation, the Frazier Entities operated, conducted, engaged in, or carried on a business or business venture in Florida, and the Frazier Entities committed a tortious act within the state of Florida.  Although Matrix ultimately acquired HealthFair, the Frazier Entities were heavily involved in the Acquisition, including by securing lending, engaging in discussions and meetings with Sellers, and participating in decision-making regarding the Acquisition.

31.     On August 28, 2017, Frazier representative Brett Moraski and Matrix representatives Walt Cooper, Wyatt Campbell, and Mark Reagen, met with HealthFair, including Ekbatani and Diaz, at HealthFair's headquarters in Winter Springs, Florida.  At the meeting, Frazier and Matrix presented a slide show with background information on the companies.  Moraski presented himself as the liaison between Frazier and Matrix, and Plaintiffs came away from the meeting with the impression that Frazier was heavily involved in the Acquisition.

32.     On October 3, 2017, representatives from Matrix and Frazier met with HealthFair representatives, including certain of the Sellers, at Matrix's call center in Largo, Florida.  Moraski attended on Frazier's behalf.

33.     An October 11, 2017 letter from investment bank SunTrust Robinson Humphrey, Inc. ("SunTrust") to Matrix regarding financing for the Acquisition addresses the letter to "Matrix Medical c/o Frazier Healthcare Partners" and "Attention: Brett Moraski."  As explained above, Moraski is the Operating Partner of Frazier.

34.     In a revised proposal to Sellers on December 17, 2017, Matrix identified Moraski as a "representative available to discuss the terms of our Revised Proposal."

35.     On December 21, 2017, Matrix representatives Walt Cooper, Wyatt Campbell, and Ed Hahn, and Frazier representatives Moraski, Berkley, and Tallman attended an on-site visit at HealthFair in Florida.  Following the visit, HealthFair's principals, including Sellers, had dinner with that group, as well as Frazier principals Magnano and Morfitt.

36.     On December 29, 2017, Frazier representative Dr. Nathan Every had a call with HealthFair employees Dr. Robert Oristaglio and Tamilyn Vandenheuvel regarding the clinical aspects of HealthFair's business.  Upon information and belief, at the time of the call, Dr. Oristaglio was located in Florida.

37.     That same day, representatives from Frazier, FTI Consulting, Inc. (a third party hired by Defendants to advise on due diligence related to the Acquisition), and HealthFair engaged in a phone call regarding FTI's investigation of HealthFair's clinical coding.  At the time of the call, the HealthFair representatives were located in Florida.

38.     In August 2018, Frazier representative Magnano had a call with Ekbatani, who was located in Florida, to discuss HealthFair's post-Acquisition operations.

39.     Venue is proper in this District pursuant to, at least, 15 U.S.C. § 22 and/or 28 U.S.C. § 1391(b) and (c) because, during the relevant period, Defendants transacted business, were found, or had agents in this District, and/or because a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.  In particular, Defendants directed their Acquisition strategy at Plaintiffs and the

other Sellers, who Defendants knew were residents of and located in Florida; through the unlawful Acquisition, Defendants acquired a company that derived a significant portion of its revenue from its Florida operations; Matrix operates a regional office in this District; and Providence transacts business in Florida and derives a significant amount of its revenue from Florida operations.

## BACKGROUND

### A.    Risk Adjustment.

40.    By way of background, risk adjustment is a statistical process that considers the underlying health status and health spending of patients when examining the patients' health outcomes or healthcare costs.   There are several risk adjustment models used in American healthcare, including the CMS model for Hierarchical Condition Categories ("HCCs") (the "CMS-HCC Model")—which is used for Medicare Advantage payors—and the HHS model for HCCs (the "HHS-HCC Model"), which is used for Affordable Care Act health plan premiums.   Both of these models rely on a complex coding process, called the ICD-10-CM, to risk adjust patients based on their existing health conditions.

### Medicare Advantage

41.    The Medicare Advantage ("MA") program allows Medicare beneficiaries to receive certain benefits from private insurers—otherwise known as "Medicare Advantage Organizations" ("MAOs")—that contract with CMS to provide benefits as an

alternative to the traditional fee-for-service Medicare program.[4] Anyone who is eligible for Medicare may enroll in an MA plan offered in the service area in which the beneficiary resides.[5] The MA program is an attractive option for beneficiaries, as the MA plans typically offer additional benefits in the form of either reduced patient cost-sharing, or access to health services that are not traditionally covered under the Medicare program.[6] In 2003, approximately 13 percent of the Medicare population was enrolled in an MA plan—by 2018, MA enrollees accounted for more than one-third of all Medicare beneficiaries.[7] Moreover, a significant percentage (more than 40 percent) of MA beneficiaries reside in just five states: California (12.7 percent of MA beneficiaries), Florida (9.9 percent of MA beneficiaries), New York (7.2 percent of MA beneficiaries), Texas (7.0 percent of MA beneficiaries), and Pennsylvania (5.4 percent of MA beneficiaries).[8]

42. CMS pays MAOs a monthly per-person amount for each beneficiary enrolled in its plan.[9] The plan payments are determined by the payor's bid, which the payor submits to CMS annually.[10] The bid consists of the payor's estimated dollar

---

[4] Report to Congress: Medicare Advantage Risk Adjustment – December 2018, https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Downloads/RTC-Dec2018.pdf, p. 3.

[5] *Id.*

[6] *Id.*

[7] *Id.*

[8] Medicare Enrollment Dashboard, https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Dashboard/Medicare-Enrollment/Enrollment%20Dashboard.html.

[9] Report to Congress: Medicare Advantage Risk Adjustment – December 2018, https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Downloads/RTC-Dec2018.pdf, p. 3.

[10] *Id.*

amount to cover the benefit package for a beneficiary of average health status in the area where the service is offered (*i.e.*, where the beneficiary resides).[11]  CMS compares these bids to the benchmark for the county, region, or state where the payor offers services (*i.e.*, the average Medicare fee-for-service cost, multiplied by a statutorily set percentage related to the geographic area's rank in a list of the highest to lowest average Medicare fee-for-service cost).[12]  The benchmark is the maximum rate CMS will pay an MAO to provide benefits in the service area for the following year.[13]  If the bid exceeds the benchmark, the payor must charge each plan member a premium to cover the difference.[14]  If the bid is below the benchmark, the payor retains a percentage of the difference between the bid and the benchmark (called the "beneficiary rebate amount"), which varies from 50 percent to 70 percent based on the payor's Star Rating.[15]  The payor can then use the beneficiary rebate amount to pay for additional benefits for its members, or to buy-down premiums.[16]

43.     CMS adjusts the per-person payment to each payor to account for the difference in health status among enrolled beneficiaries.[17]  This process, called "risk adjustment", relies on information about the health status of the enrolled beneficiaries. Thus, payors that disproportionately enroll healthy beneficiaries will be paid less than

---

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *Id.*

they would have been if they had enrolled beneficiaries with the average risk profile, while payors that disproportionately enroll the sickest patients will be paid more.[18]

44.    CMS uses a Star Rating System to measure how well MAOs perform in five categories, and assigns a rating for each category from one to five stars (five being the highest and one being the lowest).  The five performance categories are:

- Staying healthy: screening tests and vaccines**:** Assesses whether members received various screening tests, vaccines, and other check-ups to help them stay healthy.

- Managing chronic (long-term) conditions**:** Assesses how often members with certain conditions received recommended tests and treatments to help manage their chronic condition(s).

- Member experience with the payor**:** Assesses member ratings of the payor.

- Member complaints and changes in the payor's performance**:** Assesses how often Medicare discovered problems with the payor, and how often members experienced issues with the payor.  Also assesses how much the payor's performance has improved (if at all) over time.

- Health payor customer service**:** Assesses how well the payor handles member appeals.

Medicare also assigns one overall star rating to summarize performance as a whole.

45.    Star ratings matter immensely for MAOs, because bonus payments and rebates are tied to the number of stars achieved.   Plans also receive additional payments—referred to as quality bonuses—that are tied to their average quality score. Those quality scores are determined on the basis of a weighted average of ratings that reflect consumer satisfaction and the performance of the plans' providers on a range of measures related to clinical processes and health outcomes.  CMS pays higher-rated plans more in two ways.  First, plans that have composite quality scores with at least 4 out of 5

---

[18] *Id.,* p.4.

stars are paid on the basis of a benchmark that is 5 percent higher than the standard benchmark.  Second, quality scores impact plan payments through the size of the rebate that a plan receives when it bids below the benchmark.  Plans with 4.5 stars or more retain 70 percent of the difference between the bid and the quality-adjusted benchmark; plans with 3.5 to 4.0 stars retain 65 percent of that difference; and plans with 3 stars or less retain 50 percent of that difference.

46.     Fundamentally, for payors to earn high Star Ratings, providers in the payor's network need to perform well on Healthcare Effectiveness Data and Information Set ("HEDIS") measures.  HEDIS is a comprehensive set of standardized performance measures that are designed to provide purchasers and consumers with the information they need to reliably compare payor performance.[19]  CMS relies on HEDIS measures related to clinical quality performance to assess payor quality for the purpose of assigning Star Ratings.

47.     To report the necessary information for the HEDIS measures, payors must track and fill gaps in care on common measures, such as monitoring documentation of patient body mass index ("BMI") measurements or tracking A1c results (which relate to diabetes).  Many HEDIS measures included in the Star Ratings program may be calculated based on claims data to which the payor has access.  But providers, such as primary care physicians, tend not to submit claims for all of a patient's conditions, which negatively impacts the payor's ability to be reimbursed appropriately for that patient.

48.     The electronic health record system ("EHR") often contains additional

---

[19]  Centers for Medicare & Medicaid Services, https://www.cms.gov/Medicare/Health-Plans/SpecialNeedsPlans/SNP-HEDIS.

data that assists the payor in demonstrating higher performance on HEDIS measures.  For example, measures such as the HEDIS Controlling High Blood Pressure and the HEDIS Adult BMI Assessment require data that often is found in the patient's EHR, but not in the patient's claims history.  This is because the HEDIS "Controlling High Blood Pressure" measure requires blood pressure results that cannot be found using claims. Similarly, the HEDIS "Adult BMI Assessment" measure allows payors to use either BMI Percentile ICD-10-CM codes from electronic data or, more commonly, BMI vitals from supplemental data.  Thus, many MA payors will incentivize providers to submit supplemental HEDIS data from the EHR so that the payor will have a more complete dataset for Star Ratings.

**Affordable Care Act**

49.     In 2010, Congress passed the Patient Protection and Affordable Care Act ("ACA") to increase the number of Americans covered by health insurance, and to decrease the cost of healthcare.[20]  To further this goal, the ACA required private health insurers to provide coverage for individuals regardless of their health status, including preexisting conditions.[21]  Congress anticipated that these new requirements may hamper the ability of insurers to predict their healthcare costs, and to adequately price health insurance premiums as an increasing number of individuals enrolled in health insurance plans.[22]  Congress also anticipated that insurers might refuse to participate in the health insurance exchanges that the ACA created if the insurers could not reasonably estimate

---

[20] *N.M. Health Connections v. United States Dep't of Health & Human Svcs.*, 946 F.3d 1138, 1144 (10th Cir. 2019).

[21] *Id.*

[22] *Id.*

their potential costs.[23]

50.    To allay these concerns and to reallocate the risk of enrolling the sickest populations, Congress established a risk adjustment program for the individual and small group health insurance markets.[24]  Like the risk adjustment model employed by CMS, the ACA model redirects funds from plans with healthier enrollees to plans with sicker enrollees.[25]  Also similar to the model employed by CMS, the ACA model is intended to discourage insurers from avoiding enrollment of sicker enrollees.[26]  HHS is responsible for designing and implementing the HHS-HCC model, which relies in part on a statewide average premium—the average of all applicable premiums insureds pay to health insurers in a state.[27]

### **HCC Models**

51.    Although the HHS-HCC and the CMS-HCC models are similar in purpose and structure, they each have unique characteristics to address the different patient populations for which they are utilized.  Each HCC model uses patient data to predict the estimated future costs for individual patients. The CMS-HCC model is prospective, meaning data is collected in the base year to determine expected costs for the following year (the "prediction" year).  For example, data from 2018 (base year) will be used to predict expenses in 2019 (prediction year).  The ACA HHS-HCC model is concurrent, meaning the model predicts future expenditures associated with the current year's health

---

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] *Id.*

events.

52.     HCC models use two primary sources of data to determine an individual patient's risk adjustment factor ("RAF")—demographic characteristics and health status. Demographic data includes the patient's age, gender, and other factors specific to the general population.  The second primary data source—health status—is based on ICD-10-CM diagnosis codes.  While demographic data is straightforward, the collection and validation of patient diagnoses is complex.  To identify the conditions that predict future healthcare costs, HCC models first organize diseases and conditions into body systems or disease processes, called diagnostic groups.  Conditions in each diagnostic group are further organized into condition categories.  ICD-10-CM diagnosis codes are then ranked into categories that represent conditions with similar cost patterns.

53.     The top HCC categories include:

- Major depressive and bipolar disorders.
- Asthma and pulmonary disease.
- Diabetes.
- Specified heart arrhythmias.
- Congestive heart failure.
- Prostate cancer.
- Rheumatoid arthritis.
- Colorectal, breast, kidney cancer.

54.     Patients may be added to more than one category, which indicates a higher risk factor for that patient, and qualifies the health plan to receive a higher level of reimbursement for that patient.

55.     The CMS-HCC model focuses on long-term conditions such as diabetes,

chronic obstructive pulmonary disease, and congestive heart failure that impact the likelihood of future healthcare costs. The CMS-HCC model does not include acute illnesses and injuries that are not reliably predictive of ongoing healthcare costs. In contrast, the ACA HHS-HCC model accounts for both chronic and acute conditions. Examples of acute conditions include maternity care, low birth weight babies, and organ transplants, which may trigger significant healthcare costs, but generally for a discrete amount of time.

56.     Each HCC has an associated value called the relative factor. These relative factors contribute to the patient's RAF. An individual may have zero, one, or multiple HCCs that impact the RAF score that is calculated each calendar year.

57.     A major component of the HCC models is that the individual patient HCCs are valid for one year. Regardless of the chronic nature of the underlying condition related to the HCC, on January 1, the patient's HCC listing is blank. For example, a patient with diabetes with complications would need to have an annual face-to-face encounter with a provider in which the provider discusses and documents diabetes and any corresponding complications for the appropriate HCC to be reported in the new base year.

58.     Accordingly, annual, thorough clinical documentation and complete and accurate diagnosis coding are critical for compliant HCC reporting. If a sick patient's conditions are not documented by a provider each year, then the payor will not get credit for caring for that sick patient (*i.e.*, the patient will appear healthy on paper) and the payor will be inadequately reimbursed for that patient's healthcare needs. As a result,

payors place high importance on accurately recording the conditions of patients in their population on a yearly basis.  MA payors often encourage providers to have systems in place that ensure accurate and up-to-date coding.  Because coding must be done annually, many providers encourage patients to attend annual wellness visits or health fairs to ensure that coding is up to date each year. Some providers also use home visits for completion of an annual wellness visit.

59.     MA payors are at an advantage if they can collect the most complete dataset for risk adjustment.  For example, if there is a diagnosis for a patient in the patient's EHR that was not billed on a claim this year, the payor wants to know about that discrepancy in case it affects the risk score.  Thus, many payors will incentivize providers to submit supplemental diagnosis data related to risk.

60.     CMS conducts Risk Adjustment Data Validation ("RADV") audits on payors to ensure the accuracy of HCC coding.  CMS' effort to impose penalties for unsupported HCCs has increased in recent years.  For this reason, payors require first rate clinical documentation so that the payor may respond credibly to the RADV audits.

**B.     HealthFair And Matrix.**

61.     Prior to the Acquisition, HealthFair was the first and largest provider of mobile risk adjustment services to payors, including comprehensive health assessments designed to capture patients' risk scores, as well as related diagnostics necessary to document clinical conditions; and quality gap closure visits, which are used to ensure the payor recovers as much reimbursement as it is permitted under the applicable laws. Founded in 1998, HealthFair originally provided mobile health assessments directly to

consumers and in corporate markets.  In 2014, HealthFair shifted its business model to focus on MA payors.  At the time of the Acquisition, HealthFair operated 26 mobile clinics, which was the largest mobile health clinic fleet nationwide.[28]  HealthFair's clients were a mix of MA and commercial (ACA) plans and payors.

62.     The risk adjustment services industry emerged as a one-stop shop for the payors' enrollees to seek out an assessment of their existing health conditions.  Prior to the emergence of companies that exclusively perform risk adjustment services, payors were dependent upon a broad web of providers (from primary care physicians to hospitals) to diagnose and properly code patients' existing conditions.  If the patients had underlying conditions, but failed to schedule an annual visit with their providers, the payor would lose money because these patients would appear healthy on paper (as there were no diagnoses coded for those patients).  Companies such as HealthFair and Matrix partnered with these payors to ensure that patient populations who were at risk of not seeing their physicians or otherwise not obtaining clinical validation of existing conditions were seen, assessed, treated, and properly documented.  A risk adjustment company's value lies in capturing as many HCCs as exist for each patient—the more HCCs that a risk adjustment company is able to document for a payor's member population, the greater (and more accurate) the risk adjustment factor and greater the reimbursement the payor receives per member from CMS or HHS.  This process ensures that payors are adequately reimbursed for the costs of taking care of their sick population.

63.     To that end, HealthFair provided health assessments for payors' enrollees

---

[28] While other companies attempted to replicate HealthFair's model and small, copycat companies emerged over the years, none were successful.

to clinically validate HCCs for risk adjustment purposes.  These visits were often referred to as "comprehensive health assessments."  HealthFair also provided assessments to patients in order to obtain information on any gaps in care for purposes of improving the MAOs' Star Ratings.  These assessments were referred to as "care gaps assessments" or "quality gap closure visits."

64.    HealthFair had an innovative business model that, for many reasons, set HealthFair apart from other risk adjustment companies.  First, HealthFair's mobile clinic setting provided an alternative to patients who did not or could not visit their traditional providers, but who were also uncomfortable with a care visit conducted in their home.

65.    Second, by virtue of its mobile clinics, HealthFair was able to offer diagnostic and lab capabilities that in-home assessment companies lacked, such as mammography and ultrasounds, including carotid artery ultrasound, abdominal aortic aneurysm ultrasound, and echocardiogram ultrasound.  Because HealthFair could perform these diagnostics in its mobile clinics, patients avoided the process of obtaining a referral to their primary care physicians and attending an additional appointment for the diagnostic services.  And, because HealthFair employed or contracted with physicians from numerous specialties, such as cardiology, radiology, internal medicine, and ophthalmology, to interpret the diagnostic results, it could provide patients access to a one-stop, multi-specialty physician practice group.  These diagnostic services proved to be life-saving for numerous patients, as HealthFair providers were able to timely diagnose life-threatening conditions and allow the patient to immediately seek life-saving treatment.  These diagnostic services also benefited HealthFair's customers—the

payors—because HealthFair was able to adequately capture and document a host of medical conditions for use in risk adjustments related to the patients seen. Thus, these payors received a higher rate of reimbursement that more accurately captured the anticipated cost of the payors' healthcare expenditures than the payors would have from risk assessment services that lacked the range of diagnostics HealthFair provided.

66.    Third, HealthFair developed proprietary protocols to optimize the use of diagnostic testing and HealthFair's ability to identify additional conditions by way of its technology platform.

67.    Finally, while HealthFair provided healthcare services through its risk adjustment abilities, it also provided end-to-end solutions to its customer-payors in the form of logistics/scheduling, care delivery, client reporting, and care coordination, as well as clinical validation and documentation for coding and gap closure. From the time HealthFair entered into an agreement with a payor, the payor could depend on HealthFair to contact its target enrollees, schedule events that accommodate these enrollees in the enrollees' community, perform the risk assessments and any related diagnostics, coordinate any follow-up care, provide coding and documentation of the clinical outcomes, and work with the payor on any subsequent audits that might occur. In some instances, HealthFair would also offer to arrange transportation for patients to attend events, such as reserving a taxi or an Uber to transport the patient. All of these processes required complex business processes and algorithms that HealthFair honed during its 20 years of operations.

68.    HealthFair's events were cyclical based on demand from HealthFair's

customers, the payors.  Because HCCs reset annually, payors would often wait to refer patients to HealthFair until after their in-network primary care physicians had an opportunity to see their patients in the first few months of the year.  If the patient did not see his or her primary care physician, or if the payor identified gaps in the patient's care (*e.g.*, the patient did not receive a mammogram, but needed one for comprehensive evaluation and risk scoring), the payor would refer the patient to HealthFair for additional outreach.  Thus, HealthFair's services complemented those provided by primary care physicians.  Due to the cyclical nature of its business, HealthFair's revenues from the last six months of the year accounted for the vast majority of HealthFair's annual revenue.

69.   By 2017, HealthFair was the leading provider of mobile risk adjustment services in the United States.  After pivoting to MA payors, HealthFair experienced sustained year-over-year double-digit growth.  HealthFair's growth was so significant that, in 2017, it became clear that HealthFair needed a capital infusion to sustain its growth trajectory, as HealthFair was outgrowing its leased space and needed more manpower and mobile clinics.

70.   Matrix is a leading provider of home-based risk adjustment services for payors, including comprehensive health assessments and quality gap closure visits.  As part of these services, Matrix performs in-home lab services and diagnostics, including diabetic retinal exams, ankle brachial index tests, and neuropathy screening.

71.   Matrix is indirectly owned by Providence and the Frazier Entities.  Prior to

26

2016, Matrix was a wholly owned subsidiary of Providence.[29]   In October 2016, the Frazier Entities purchased a 53.2 percent equity interest in Matrix, with Providence retaining 46.8 percent.[30]   Concurrently with the Acquisition, the Frazier Entities and Providence exchanged their equity interests in Matrix for similar, proportionate ownership shares (after accounting for Sellers' rollover shares) of a new Delaware limited liability company, Mercury Parent, LLC ("Mercury Parent"), and Matrix became a wholly owned subsidiary of Mercury Parent.

72.   The same Board of Directors controls Mercury Parent and Matrix.   This Board is comprised as follows: Three seats for Frazier, two seats for Providence, and one seat for the Matrix CEO.   A seventh member is selected jointly by Providence and Frazier.

73.   Prior to the Acquisition at issue in this litigation, Matrix and HealthFair were direct competitors in the market for risk adjustment services.   For example, both Matrix and HealthFair provided risk adjustment services to insurance plan WellCare Health Plans, Inc. ("WellCare").   WellCare is headquartered in Tampa, Florida, and focuses primarily on providing government-sponsored, managed care services to individuals through Medicaid, Medicare Advantage, and Medicare, as well as through the ACA exchange.

74.   In approximately September 2017, WellCare informed its risk adjustment

---

[29]   Providence Service Corporation, SEC Filings, 3/01/19 Providence Form 10-K, https://investor.prscholdings.com/financial-information/sec-filings?field_nir_sec_form_group_target_id%5B%5D=471&field_nir_sec_date_filed_value=&items_per_page=10#views-exposed-form-widget-sec-filings-table, p. 78.

[30]   *Id.*, p. 40.

providers that WellCare would use its process for requests for proposal ("RFPs") to select two to three vendors of risk adjustment services. WellCare advised its risk adjustment providers that it intended to select at least one provider with a mobile solution.

75.     Both Matrix and HealthFair submitted RFPs to WellCare. In October 2017, WellCare selected HealthFair as a partner for its 2018 risk assessments. Matrix was not selected.

76.     In approximately November 2017, HealthFair was awarded a national contract with UnitedHealth Group. UnitedHealth accounted for approximately 25 percent of the MA payor market and insured approximately 5 million MA beneficiaries. While Matrix desired to do business with UnitedHealth given UnitedHealth's size and reach, Matrix did not have a contract with UnitedHealth.

### C.     The Acquisition And Related Due Diligence.

77.     Confronted by HealthFair's staggering growth and the realization that HealthFair had insufficient capital to make the investments necessary to continue its growth trajectory, HealthFair's owners began to contemplate the possibility of selling HealthFair to a company that possessed the capital needed to fund HealthFair's expansion. HealthFair contacted an investment bank to assist with the process of introducing potential buyers to HealthFair.

78.     On August 28, 2017, Frazier representative Brett Moraski, Matrix representatives Walt Cooper, Wyatt Campbell, and Mark Reagen, and SunTrust representative Sameer Chugh met with Ekbatani, Diaz, and HealthFair at HealthFair's headquarters in Winter Springs, Florida. At the meeting, Frazier and Matrix presented a

slide show with background information on the companies, which included information regarding Frazier Healthcare Partners and Providence.

79.     In addition to this initial meeting, the Frazier Entities were actively involved in the entire due diligence process related to the Acquisition, as well as the mechanics of the Acquisition (including negotiation of key provisions and funding), and the decision to acquire HealthFair.  As detailed in Paragraphs 26 to 37, the Frazier Entities: (1) were actively involved in, and in fact led, the discussions with investment bank SunTrust regarding the financing needed to acquire HealthFair; (2) sent a representative to an October 3, 2017 meeting with Ekbatani and HealthFair at Matrix's call center in Largo, Florida; (3) participated in internal discussions with Matrix regarding negotiation of the terms of the Acquisition with Sellers; (4) identified their representative, Moraski, to Ekbatani and HealthFair as a "representative available to discuss the terms" of Matrix's revised proposal; (5) sent representatives to an on-site visit on December 21, 2017 with Ekbatani and others at HealthFair in Florida, and to a dinner that night with Ekbatani and other HealthFair employees; (6) consulted with HealthFair employees Dr. Robert Oristaglio and Tamilyn Vandenheuvel regarding the clinical aspects of HealthFair's business; and (7) engaged in a phone call with HealthFair and FTI Consulting, Inc. regarding FTI's due diligence investigation of HealthFair's clinical coding. Frazier representatives also approved the Acquisition.  Upon information and belief, Frazier's involvement in the Acquisition was even more extensive than the facts known at the time of this Complaint.  Further, the Frazier Entities remained involved following the Acquisition—among other things, they participated in meetings regarding

the integration of HealthFair and Matrix; communicated with Ekbatani on at least two occasions regarding HealthFair operations post-Acquisition; and participated in decision-making related to HealthFair operations.

80.     Providence was also actively involved in the Acquisition.   Upon information and belief, Providence was involved in initial discussions about the Acquisition with Frazier and Matrix in late 2017.   Upon information and belief, Providence also was involved in approval of the Acquisition, and decision-making related to HealthFair's post-Acquisition operations.

81.     Although HealthFair had several potential buyers, Sellers went forward with Matrix because Defendants made numerous representations regarding HealthFair's expected growth, available capital for expanding HealthFair's business, the need and desire to retain key HealthFair management, the desire to acquire additional mobile units, Matrix's access to additional nurse practitioners through its existing network, and Matrix's ability to provide additional call centers and sophistication.   Ekbatani and the other Sellers viewed Defendants as viable partners to execute on Sellers' desire to see HealthFair achieve its potential for further service, expansion, and success.

82.     In January 2018, Matrix, HealthFair, and Sellers entered into a Securities Purchase Agreement (the "SPA"), whereby Sellers sold all outstanding equity interests in HealthFair to Matrix.   Ekbatani executed the SPA in his individual capacity, as well as CEO of HealthFair and as Sellers' Representative.

83.     During negotiations regarding the SPA, the parties also agreed to defer a portion of the purchase price, which would be paid as an earnout payment (the

"Earnout"). The Earnout was structured as a contingent payment that would be triggered by certain benchmarks of HealthFair's performance in the year following the sale. In particular, if HealthFair's "Direct Profit"—defined to mean HealthFair's revenue less Direct Expenses—exceeded $42,100,000 (the "Earnout Threshold"), Sellers were entitled to an Earnout payment that would increase as HealthFair's Direct Profit incrementally increased above the Earnout Threshold. [SPA, Section 1.06(a)] Sellers agreed to this deferred compensation structure in part to accommodate funding requirements to which Matrix was subjected in connection with the Acquisition, and also because Sellers were confident in HealthFair's continued growth given Matrix's assurances of increased investment in HealthFair. At the time of the SPA, the parties jointly projected that HealthFair's revenues for 2018 would total $112 million, which would have entitled Sellers to an additional $75 million in Earnout compensation. This projection was attached to the SPA.

84. The Direct Profit from the Earnout year was to be determined based on the Earnout Statement provided by Matrix, which Matrix was obligated to prepare and deliver to Sellers by April 30, 2019. [SPA, Section 1.06(c)] The Earnout Statement was to include the amount of Direct Profit from the Earnout year, as well as reasonable supporting data and work papers for the Earnout payment. [*Id.*] The SPA granted Ekbatani, as the Sellers' Representative, the right of reasonable access to HealthFair's post-Acquisition books and records and personnel, during normal hours and upon reasonable advance notice, for the purpose of verifying Matrix's determination and computation of the Direct Profit. [*Id.*]

85.     By the SPA's terms, and in addition to the contingent Earnout, Sellers were due to receive $160 million, which included $36,367,046 that was converted into a rollover of 24,158,682 units of Mercury Parent's Class B Common Units.  The parties to the SPA agreed to escrow $10 million of the purchase price for use in adjustments related to the parties' representations and warranties. The purchase price was subject to working capital adjustments, which the parties ultimately made.

86.     As a result of the Acquisition and Plaintiffs' shares in Mercury Parent, Plaintiffs remain in the market for risk-adjustment services.  Additionally, Plaintiffs were entitled to an Earnout based on HealthFair's post-Acquisition performance and, as a result, stood to benefit directly from competition in the market for risk adjustment services.

**D.     The Post-Acquisition Landscape.**

87.     Around the time of the Acquisition, third parties projected that Matrix and HealthFair would increase their respective businesses as a result of the Acquisition. Throughout due diligence, Defendants communicated to Plaintiffs that Defendants viewed HealthFair as an innovative addition to Matrix's portfolio, which would give Matrix's customers a new, desirable option (mobile rather in-home services) and thereby enable Matrix to reach more members and drive higher member engagement.

88.     By February 2018, after the Acquisition closed, only three major competitors in the risk adjustment services market remained: Matrix, CenseoHealth ("Censeo"), and MedXM.   In addition to Matrix's Acquisition of HealthFair, these competitors entered into their own transactions in 2018 which served to further

32

concentrate market power in the hands of a limited number of competitors—Censeo acquired former competitor Advance Health and renamed the resulting combination Signify Health, and MedXM was acquired by Quest.[31]  None of these providers offered a mobile solution—all provided home-based risk adjustment services.

89.     In connection with the Acquisition, Matrix retained key HealthFair personnel, including Ekbatani, Diaz, Ray Ekbatani (HealthFair Chief Administrative Officer), Shawn Ekbatani (HealthFair Chief Information Technology Officer), Tamilyn Vandenheuvel (HealthFair Director of Clinical Operations), Ivonne Oladunni (HealthFair Director of Compliance), Marissa Jensen (HealthFair Director of Health Plans Management), and Michael Radka (HealthFair Human Resources Director).  By summer 2018—just a few short months after the Acquisition closed—Matrix had either terminated the services of, or otherwise forced out, all of these key individuals.

90.     A few months after the Acquisition, it was clear that Matrix had reduced HealthFair's output significantly.  HealthFair's daily appointments were reduced by approximately 50 percent.  By May 2018, HealthFair's top line revenue was off from the prior year by at least 40 percent.  This reduction was significant because, until 2018, HealthFair experienced double-digit year-over-year growth.  Upon information and belief, since May 2018, Matrix has further reduced the number of HealthFair events and patients seen.

---

[31]  Quest Diagnostics to Acquire MedXM, Expanding its Health Risk Assessment Services to Close Gaps in Care, (Jan. 23, 2018),  https://www.biospace.com/article/releases/quest-diagnostics-to-acquire-medxm-expanding-its-health-risk-assessment-services-to-close-gaps-in-care/;  CenseoHealth and Advance Health Announce Investment by New Mountain Capital, (Dec. 7, 2017), https://www.prnewswire.com/news-releases/censeohealth-and-advance-health-announce-investment-by-new-mountain-capital-300568404.html.

91.    Since significantly reducing HealthFair's output, Defendants have successfully increased Matrix's prices for its in-home services.  In Providence's Q4 2019 and Full Year 2019 Earnings Presentation, Providence explained that Matrix's revenue growth in 2019 was "primarily driven by higher activity and successful rate increases throughout the year[.]"[32]    Additionally, on Providence's Q4 2019 earnings call, Providence's Chief Financial Officer, Kevin Dotts, engaged in the following exchange, in which he highlighted Matrix's at-home "services being offered at higher price points," and "improved average sales price[s]":[33]

> **Bob Labick** -- *CJS Securities -- Analyst*
>
> Got it. OK. That's great. And then on Matrix, I think you said this.
>
> I just want to verify. How is the core Matrix doing? And is it -- were most of the losses from just bigger losses at HealthFair/mobile? And is there an opportunity to turn that around in 2020? Or is that something that has to be shut? Or what can happen with the mobile/HealthFair?
>
> **Kevin Dotts** -- *Chief Financial Officer*
>
> Yes. I'd characterize it this way. I think you're exactly right. I think we saw the home health services side of the business continue to grow through the year.
>
> We are seeing additional services being offered at higher price points. So I think the expectations are for 2020 that the home health services will continue to demonstrate good growth, improved average sales price. That will offset, I think, what is, again, the drag that they're seeing from the mobile business at this point.

92.    On March 26, 2019, Matrix provided Ekbatani, as the Sellers' Representative, with the Earnout Statement required by the SPA.  The Earnout Statement asserted that the Earnout owed to Sellers was zero.  The Earnout Statement included just a short, half-page financial computation, without the supporting work papers required by

---

[32] Providence Service Corp., <u>Q4 2019 and Full Year 2019 Earnings Presentation</u>, (Feb. 27, 2020), <u>https://investor.prscholdings.com/static-files/5547919c-4462-491b-8ed6-aeb2f453568d</u>.

[33] Providence Service (PRSC) Q4 2019 Earnings Call Transcript (Feb. 28, 2020), <u>https://www.fool.com/earnings/call-transcripts/2020/02/28/providence-service-prsc-q4-2019-earnings-call-tran.aspx</u>.

the SPA.   According to Matrix's calculations, the Direct Profit from 2018 was $14,173,684.  This number was orders of magnitude lower than the 2018 HealthFair revenues jointly projected by Defendants and HealthFair.   Although Sellers have repeatedly requested supporting documentation, Matrix has steadfastly refused to provide this information.

93.    On April 2, 2019, Matrix filed suit against Plaintiffs and other former HealthFair owners or employees in Seminole County, Florida in a case styled as *Community Care Health Network, LLC v. Ekbatani*, Case No. 2019-CA-000999.  In that case, Matrix alleged that the defendants breached several representations and warranties contained in the SPA, and/or that several representations and warranties were false at the time they were made.  In response, Sellers asserted counterclaims for breach of the SPA, including by alleging that Matrix breached the Earnout provision by acting in bad faith to prevent achievement of the thresholds that trigger an Earnout payment; diverting business from HealthFair to Matrix; and by failing to provide the required information in support of Matrix's Earnout Statement.   Sellers also alleged that Matrix breached the SPA indemnification provision requiring timely notice when Matrix failed to include adequate information about the nature of its indemnification claims with its indemnification notice. Sellers further alleged that Matrix breached the indemnification provision requiring Matrix to provide Sellers with an opportunity to participate in the defense of third-party claims, and Matrix breached its escrow obligations.

94.    Based on Defendants' intentional withdrawal from the mobile part of the risk adjustment services marketplace, Plaintiffs bring this action to vindicate the harm to

consumers and to recover antitrust damages due to them.

## COUNT I

### (Unlawful Asset Acquisition – Clayton Act § 7)

95.     Plaintiffs restate and incorporate by reference the allegations set forth in Paragraphs 1 to 94 as if fully alleged herein.

**A.     The Relevant Market.**

96.     The relevant product market consists of risk adjustment services offered to payors (*i.e.*, health plans and risk-bearing providers).  This product market includes comprehensive health assessments designed to capture patients' risk scores, as well as related diagnostics necessary to document clinical conditions; quality gap closures, which are used to ensure the payor recovers as much reimbursement as it is permitted under the applicable laws; and services related to Star Ratings and HEDIS measures, which impact a payor's reimbursement based on risk adjustments and for achieving quality benchmarks and measures.

97.     This product market satisfies the well-accepted "hypothetical monopolist" test set forth in the U.S. Department of Justice's 2010 Horizontal Merger Guidelines ("Guidelines").  A hypothetical monopolist of risk adjustment services offered to payors likely would impose a small but significant and non-transitory price increase, because an insufficient number of payors would stop purchasing the service to make the price increase unprofitable.  Because the CMS-HCC and HHS-HCC models require the complex risk adjustment process as a means to fund payors that provide MA plans or plans on the ACA exchanges, very few, if any, payors will stop buying risk adjustment

services in the event of a small but significant price increase.  Nor will a sufficient number of payors likely assume the obligation to provide their own risk adjustment services, as these payors are wholly dependent upon third parties such as doctors and nurse practitioners to see and diagnose their insureds.

98.     The relevant geographic market is Florida.  Because HealthFair and Matrix competed for contracts that were either state by state, or national contracts whereby the payor would assign HealthFair or Matrix work on a state-by-state basis, this geographic market is justified.  Moreover, prior to the Acquisition, HealthFair conducted a significant percentage of its business in Florida.  Following the Acquisition, Matrix decreased HealthFair's output in Florida, to the detriment of competition within Florida. The MA population in Florida is high and, as a result, payors that operate in Florida and serve insureds located in Florida are unlikely to pull out of the Florida market in response to a small but significant and non-transitory price increase.  Other factors impact a payor's ability to procure risk adjustment services from outside Florida in response to a small but significant and non-transitory price increase—for example, payors are limited to risk adjustment services companies that employ medical staff licensed in a particular state (*e.g.*, nurses, nurse practitioners, and physicians).  Thus, faced with a small but significant and non-transitory price increase in Florida, a payor could not simply hire a risk adjustment services company with operations in other states to replace its services provider in Florida.

**B.      The Effect Of The HealthFair Acquisition Has Been, And Will Continue To Be, To Substantially Lessen Competition In The Relevant Market.**

99.      The effect of the Acquisition has been to substantially lessen competition in the relevant market.   By combining Matrix with HealthFair and then significantly suppressing HealthFair's mobile operations, Defendants eliminated a substitute product for Matrix's own in-home offerings and removed an innovative competitor from the market.   Moreover, this Acquisition has led to, or will probably lead to, anticompetitive effects in the relevant market.

**Market Share**

100.      Following the Acquisition, Matrix's resulting market share in the relevant market increased and contributed to increased concentration of competition within the relevant market.   Matrix's market share is evidenced by, among other things, public statements by Providence in its 2020 Form 10-K, in which Providence stated that, following the Acquisition, Matrix and Signify Health are the "largest independent providers" of comprehensive health assessments to health plans.   Upon information and belief, Matrix's market share in the relevant market prior to the Acquisition was greater than 30 percent.   HealthFair's market share in the relevant market prior to the Acquisition was at least 5 percent.   Accordingly, by virtue of the Acquisition, Matrix holds a market share of at least 35 percent of the relevant market.

**Harm to Competition**

101.      The Acquisition harmed, or threatens to harm, competition in the relevant market in the following ways.   First, the Acquisition eliminated head-to-head competition

between Matrix and HealthFair and suppressed HealthFair's output in the relevant market. As evidenced by HealthFair's explosive growth and innovative business model, at least prior to the Acquisition, HealthFair was an aggressive competitor in the highly concentrated relevant market. HealthFair was able to leverage its capabilities to take market share from the incumbent competitors, including Matrix. Among other wins, HealthFair was awarded WellCare's business through its RFP process, while Matrix was denied that business. Thus, by acquiring HealthFair, Defendants eliminated the head-to-head competition between the two companies.

102.    By reducing the number of competitors, Defendants prevented buyers from obtaining competing bids from Matrix and HealthFair, as competing sellers, and playing the two firms against one another in negotiations. In a market where competitors compete for the same contracts, a merger between two competing sellers has the effect of limiting the buyers' ability to play the sellers against one another in negotiations. In turn, Matrix, as the merged entity, has the ability and incentive to obtain a result more favorable to it (*e.g.*, by charging higher prices), and less favorable to the buyer, than Matrix and HealthFair would have offered separately before the merger. Indeed, by removing HealthFair from the market, Matrix eliminated a competitor that would have otherwise submitted competitive bids for the same customers as Matrix, driving down the resulting prices through a competitive bidding process.

103.    High barriers to entry exist in the relevant market. Few market entrants in the relevant market are successful—a market entrant must navigate a complex system of payors, coding, staffing, and patient engagement, and these barriers keep many from

trying to compete (*e.g.*, physicians do not want to learn or engage in the complex coding system required to complete the risk adjustment process).  Matrix relied on these high barriers to entry when it acquired HealthFair.

104.    By acquiring HealthFair and subsequently suppressing output from the mobile side, Matrix diminished innovation in the relevant market.   HealthFair's innovations were numerous: (1) HealthFair was the first and largest risk adjustment company to provide a mobile platform; (2) HealthFair provided additional diagnostics to more accurately capture the anticipated cost of the payors' healthcare expenditures, thereby increasing its customers' rate of reimbursement; (3) due to these additional diagnostics, HealthFair provided a multi-specialty physician practice; (4) HealthFair had proprietary protocols to optimize the use of diagnostic testing and the ability to identify new conditions via its technology platform; and (5) HealthFair provided end-to-end solutions, including logistics/scheduling, care delivery, client reporting, and care coordination, as well as clinical validation and documentation for coding and gap closure.

105.    For example, WellCare acknowledged that it selected HealthFair from the RFP process because WellCare "wanted the capability to do mobile assessments if needed."  Thus, HealthFair's innovative mobile platform was the reason HealthFair won the RFP over Matrix.

106.    Knowing that HealthFair's product—mobile risk adjustment services— was a close substitute to Matrix's at-home services, and having been dealt the loss of WellCare to HealthFair because WellCare preferred HealthFair's mobile offerings over Matrix's at-home services, Defendants acquired HealthFair and reduced output from

HealthFair's mobile operations following the Acquisition. Defendants did so to suppress an innovative product that competed with Matrix's own at-home offerings—by virtue of the Acquisition, Matrix had access to HealthFair's customers (the payors), including UnitedHealth Group. UnitedHealth accounted for approximately 25 percent of the MA payor market and insured approximately 5 million MA beneficiaries. As a result, Matrix could (and did) selectively market its at-home assessments rather than the mobile assessments. As explained in paragraph 91, after the Acquisition, Matrix increased prices on its at-home assessments and services in the relevant market.

107.    The Merger Guidelines state that:

> If a merged firm would withdraw a product that a significant number of customers strongly prefer to those products that would remain available, this can constitute a harm to customers over and above any effects on the price or quality of any given product. If there is evidence of such an effect, the Agencies may inquire whether the reduction in variety is largely due to a loss of competitive incentives attributable to the merger. An anticompetitive incentive to eliminate a product as a result of the merger is greater and more likely, the larger is the share of profits from that product coming at the expense of profits from products sold by the merger partner. Where a merger substantially reduces competition by bringing two close substitute products under common ownership, and one of those products is eliminated, the merger will often also lead to a price increase on the remaining product, but that is not a necessary condition for anticompetitive effect.

U.S. Dep't of Justice, *2010 Horizontal Merger Guidelines* § 6.4.

108.    Defendants' motives in lessening competition were anticompetitive and improper. Defendants suppressed HealthFair's mobile risk adjustment operations in order to maximize Defendants' profits from Matrix's in-home offerings. By eliminating HealthFair from the market, Defendants effectively eliminated mobile risk adjustment services as a substitute for Matrix's in-home offerings. They did so to impede growth in

mobile offerings, which payors were increasingly selecting as a superior substitute for Matrix's in-home services.  Due to the barriers to entry identified herein, Defendants knew that, once HealthFair was removed from the market, another competitor with mobile offerings—particularly mobile offerings on a scale that would pose a threat to Matrix's business model—was unlikely to emerge.

109.    Both payors and insureds have been harmed by Defendants' conduct.  As explained herein, HealthFair provided a range of diagnostic services that provided increased risk adjustment capabilities.  Ultimately, these risk adjustment capabilities translated into capturing more accurately the risk profile of the patients enrolled by HealthFair's customers.  Thus, HealthFair's customers were able to seek reimbursement according to accurate risk adjustments, reducing the likelihood that the customer's bid to CMS would exceed the benchmark.  If the bid exceeds the benchmark, the payor must charge each plan member a premium to cover the difference.  Because Defendants deprived payors of HealthFair's services, payors were left with at-home assessments, which do not capture the same level of risk as the mobile assessments.  Thus, payors were ultimately left with a less accurate risk adjustment, increasing the likelihood that the payor's bid to CMS would exceed the benchmark, lessening the payments the payor receives from CMS (harming the payors), and triggering additional premium obligations from the payor's insureds (harming the insureds).

110.    Plaintiffs also have been harmed by Defendants' conduct.  Because Sellers were entitled to payments contingent on HealthFair's post-Acquisition performance and also received shares of Mercury Parent, Plaintiffs stood to benefit directly from a

procompetitive integration of the two firms following the Acquisition and increased output from HealthFair's innovative mobile operations. By eliminating an innovative competitor and suppressing HealthFair's output, however, Defendants deprived Plaintiffs of income they would have otherwise received had Defendants not lessened competition. Indeed, Plaintiffs were entitled to payments that were contingent on HealthFair's performance, and such payments were tied directly to HealthFair's level of output. As a result, Plaintiffs' injury flows directly from Defendants' unexpected efforts to reduce output of HealthFair's innovative mobile product in the relevant market, inextricably tying Plaintiffs' injury to the harm Defendants inflicted to competition. By lessening competition through Matrix's suppression of mobile operations output, Plaintiffs were deprived of the payments to which they were entitled, and the benefits they would have otherwise received from their shares in Mercury Parent, absent Defendants' anticompetitive conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.     A judgment in favor of Plaintiffs and against Defendants for violating Section 7 of the Clayton Act;

B.     Preliminary and permanent injunctive relief in favor of Plaintiffs, including without limitation an order that Matrix divest the equity interests acquired by virtue of the SPA, sufficient to create a separate, distinct, and viable competing firm that can replicate HealthFair's competitive significance in the marketplace before the Acquisition, or otherwise to restore competition to the risk adjustment services market

comparable to that which existed before the unlawful Acquisition, under Clayton Act, 15 U.S.C. § 16;

   C.  An award of damages to Plaintiffs, including special damages and lost profits, in an amount to be proven at trial;

   D.  Pursuant to the Clayton Act, 15 U.S.C. § 15(a), damages equal to treble the amount of economic injury sustained by Plaintiffs due to conduct that violates the Clayton Act;

   E.  An award of Plaintiffs' reasonable attorneys' fees and costs of suit, including pursuant to the Clayton Act, 15 U.S.C. § 15(a);

   F.  An award of pre-judgment and post-judgment interest; and

   G.  Such other and further relief as the Court deems just, proper, and equitable in the circumstances.

## DEMAND FOR JURY TRIAL

   Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs respectfully demand a trial by jury of all issues triable of right by a jury.

   DATED this 7th day of December, 2020.

          /s/ Michael A. Sasso
          Michael A. Sasso
          Florida Bar No. 93814
          SASSO & SASSO, P.A.
          1031 West Morse Boulevard, Suite 120
          Winter Park, Florida 32789
          Telephone:  (407) 644-7161
          Facsimile:  (407) 629-6727
          E-mail:  masasso@sasso-law.com

Lawrence G. Scarborough
(*Pro Hac Vice* Forthcoming)
Kathryn E. Bettini
(*Pro Hac Vice* Forthcoming)
BRYAN CAVE LEIGHTON PAISNER LLP
Two North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4406
Telephone:  (602) 364-7000
Facsimile:  (602) 364-7070
E-mail:  lgscarborough@bclplaw.com
E-mail:  kathryn.bettini@bclplaw.com

Randall H. Miller
(*Pro Hac Vice* Forthcoming)
Desmonne A. Bennett
(*Pro Hac Vice* Forthcoming)
BRYAN CAVE LEIGHTON PAISNER LLP
1700 Lincoln Street, Suite 4100
Denver, Colorado 80203
Telephone:  (303) 861-7000
Facsimile:  (303) 866-0200
E-mail:  randy.miller@bclplaw.com
E-mail:  desmonne.bennett@bclplaw.com

*Counsel for Plaintiffs*

602153430