UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

SHAHRIAR "JAMES" EKBATANI, SHAHRZAD EKBATANI and TERRENCE DIAZ,

        Plaintiffs,

v.                              Case No: 6:20-cv-2224-PGB-DCI

COMMUNITY CARE HEALTH NETWORK, LLC, FRAZIER MANAGEMENT, LLC, FRAZIER HEALTHCARE VENTURES, FRAZIER HEALTHCARE VII, L.P., FRAZIER HEALTHCARE VII-A, L.P., FRAZIER HEALTHCARE GROWTH BUYOUT FUND VIII, L.P., FRAZIER HEALTHCARE GROWTH BUYOUT AFFILIATES VIII, L.P. and THE PROVIDENCE SERVICE CORPORATION,

        Defendants.
_____/

## ORDER

    This cause is before the Court on Defendants' Motion to Dismiss (Doc. 42 (the "**Motion**")) and Plaintiffs' response thereto. Upon consideration, the Motion is due to be granted.

I.  **BACKGROUND**

Increasingly, a healthcare payor providing services under Medicare and the Affordable Care Act obtains prospective reimbursement from governmental entities rather than fee-for-service reimbursement. (Doc. 1, ¶¶ 2, 4).[1] This prospective reimbursement system relies on "risk adjustment," which modifies the reimbursement payments made by these governmental entities to a healthcare payor in accordance with the health level of the healthcare payor's enrolled population. (*Id.* ¶ 2). A healthcare payor retains a risk adjustment service provider to assess its enrolled population for existing health conditions that may cause higher utilization of healthcare services and, correspondingly, higher costs to the health plans. (*Id.* ¶ 3).

Plaintiffs Shahriar Ekbatani, Shahrzad Ekbatani, and Terrence Diaz are former owners of DPN USA, LLC, doing business as HealthFair ("**HealthFair**"). (*Id.* ¶¶ 1, 6). HealthFair is a risk adjustment service provider that conducts assessments in mobile clinics deployed to enrollees' communities at intervals. (*Id.* ¶ 5). Defendants include: (1) Community Care Health Network, LLC, doing business as Matrix Medical Network ("**Matrix**"), a risk adjustment service provider that conducts assessments at enrollees' homes; and (2) entities that

---

[1]  Healthcare payors are health insurance plans and risk-bearing providers. (*Id.* ¶ 2). Governmental entities that provide reimbursement under Medicare and the Affordable Care Act include the Centers for Medicare and Medicaid Services and the Department of Health and Human Services. (*Id.* ¶ 4).

possess an indirect interest in Defendant Matrix via their ownership shares in its parent company. (*Id.* ¶¶ 5, 70–71).

In January 2018, after a competitive bidding process, Plaintiffs, HealthFair, and Defendant Matrix executed a Securities Purchase Agreement (the "**SPA**") wherein Plaintiffs sold their equity interests in HealthFair to Defendant Matrix for $160 million, including $36,367,046 converted into a rollover of 24,158,682 units of Defendant Matrix's parent company (the "**Acquisition**"). (*Id.* ¶¶ 6–7, 82, 85). The SPA also gave Plaintiffs the potential to earn an additional payout if HealthFair's performance in the year following the Acquisition met certain benchmarks (the "**Earnout Payment**"). (*Id.* ¶¶ 7, 83). The parties predicted that Plaintiffs' Earnout Payment would total $75 million based on HealthFair's past performance and growth. (*Id.* ¶ 83).

On April 2, 2019, Defendant Matrix sued Plaintiffs and other former HealthFair owners and employees in Florida state court (the "**State Court Action**"). (*Id.* ¶ 93). Defendant Matrix alleged that Plaintiffs misrepresented HealthCare's value and sought recission of the SPA on breach of contract and fraud grounds. (Doc. 1, ¶ 93; Doc. 43-1, pp. 8–32; Doc. 50-2, ¶¶ 52–71). Plaintiffs filed a counterclaim alleging that Defendant Matrix diverted business opportunities from HealthFair to prevent them from receiving the Earnout Payment. (Doc. 1, ¶ 93; Doc. 43-1, pp. 55–78; Doc. 50-3, ¶¶ 87–121).

On December 7, 2020, Plaintiffs initiated the instant action, asserting that Defendants violated Section 7 of the Clayton Act by "us[ing] the Acquisition to

3

control and suppress an innovative competitor and substantially reduce competition in the market for the provision of risk adjustment services." (Doc. 1, ¶¶ 1, 8–12, 94, 101–10). They claim that the Acquisition harmed healthcare payors and insureds by eliminating the competition between Defendant Matrix and HealthFair, reducing the number of competitors in the market, diminishing market innovation and the availability of more accurate services, and raising prices of at-home risk adjustment services. (*Id.* ¶¶ 91, 101–110). They also claim that Defendants harmed them by depriving them of their Earnout Payment and other financial gains they would have received as shareholders of Defendant Matrix's parent company. (*Id.* ¶ 110).

Defendants now move for dismissal, arguing that the Complaint fails to plausibly allege antitrust standing. (Doc. 42). The matter is ripe for review.

## II.   STANDARD OF REVIEW

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(1). Thus, to survive a motion to dismiss made pursuant to Rule 12(b)(6), the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* To assess the sufficiency of factual content and the plausibility of a claim, courts draw on their

"judicial experience and common sense" in considering: (1) the exhibits attached to the complaint; (2) matters that are subject to judicial notice; and (3) documents that are undisputed and central to a plaintiff's claim. *See Iqbal*, 556 U.S. at 678; *Parham v. Seattle Serv. Bureau, Inc.*, 224 F. Supp. 3d 1268, 1271 (M.D. Fla. 2016).

Though a complaint need not contain detailed factual allegations, mere legal conclusions or recitation of the elements of a claim are not enough. *Twombly*, 550 U.S. at 555. Moreover, courts are "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. Courts must also view the complaint in the light most favorable to the plaintiff and must resolve any doubts as to the sufficiency of the complaint in the plaintiff's favor. *Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1483 (11th Cir. 1994) (per curiam).

In sum, courts must (1) ignore conclusory allegations, bald legal assertions, and formulaic recitations of the elements of a claim; (2) accept well-pled factual allegations as true; and (3) view well-pled allegations in the light most favorable to the plaintiff. *Iqbal*, 556 U.S. at 679.

## III.   DISCUSSION

Section 7 of the Clayton Act prohibits mergers "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or tend to create a monopoly." 15 U.S.C. § 18. Section 4 of the Clayton Act authorizes treble

damages and broadly states that "any person who shall be injured . . . by reason of anything forbidden in the antitrust laws may sue." 15 U.S.C. § 15(a).

However, courts do not interpret Section 4 as expansively as its language suggests, instead recognizing that antitrust standing "involves an analysis of prudential considerations aimed at preserving the effective enforcement of the antitrust laws." *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1448–49 (11th Cir. 1991) (citations omitted); *see Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983) ("Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action."). The Eleventh Circuit employs a two-prong test for antitrust standing: (1) the plaintiff must establish that it has suffered an antitrust injury; and (2) the plaintiff must be an "efficient enforcer" of the antitrust laws. *Sunbeam Television Corp. v. Nielsen Media Rsch., Inc.*, 711 F.3d 1264, 1270–71 (11th Cir. 2013).

Under the first prong, the plaintiff must demonstrate that its injury is "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be 'the type of loss that the claimed violations . . . would be likely to cause.'" *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (quoting *Zenith Radio Corp. v. Hazeltine Rsch.*, 395 U.S. 100, 125

6

(1969)); *see Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1299 (11th Cir. 2010) ("The antitrust injury requirement ensures that the plaintiff, although motivated by private interests, is seeking to vindicate the type of injury to the public that the antitrust laws were designed to prevent.").

Here, Defendants contend that dismissal is appropriate because Plaintiffs' alleged financial injuries as recipients of the Earnout Payment and as stockholders of Defendant Matrix's parent company do not reflect the anticompetitive effect of Defendants' alleged Section 7 violation. (Doc. 42). The Court agrees.

Ultimately, Plaintiffs' financial loss flows from Defendants' fraudulent conduct as to the SPA's Earnout Provision—not the Acquisition's substantial lessening of competition in the risk adjustment service provider market. *See Brunswick*, 429 U.S. at 489. The diminishment of competition is the inevitable outcome of Plaintiffs' voluntary, contractual withdrawal from the market. Therefore, Defendants' breach and the ensuing monetary loss to Plaintiffs do not amount to an antitrust injury because Plaintiffs' market exit and the consequent reduction in competition "would have resulted even without the breach of contract." *Synco, Inc. v. Penn Cent. Corp.*, 551 F. Supp. 949, 952 (E.D. Pa. 1982) (dismissing the plaintiff's antitrust claim that the defendants intentionally lost customers and sales to subvert the acquisition agreement's payout provision because the diminished number of competitors resulted from the plaintiff's

voluntary, contractual withdrawal from the petroleum market).[2] In other words, if Plaintiffs had received the Earnout Payment, then they would not have suffered an injury and could not have asserted standing, but the risk adjustment service provider market would have still sustained an injury. *See, e.g.*, *Turner v. Johnson & Johnson*, 809 F.2d 90, 102 (1st Cir. 1986) (stating that the plaintiffs' injury—the deprivation of certain royalties due to the defendant's acquisition and subsequent suppression of the plaintiffs' electronic thermometer product—was not an antitrust injury because "[i]f the sale of assets had an effect on competition, it would have occurred whether or not [the plaintiffs were] harmed").

Likewise, Plaintiffs' financial loss as stockholders of Defendant Matrix's parent company is not an antitrust injury. First, it is worth noting that this vaguely alleged "loss of income" is completely conjectural. (*See* Doc. 1, ¶ 110). It is unclear whether Plaintiffs' ownership interests "would be served or disserved by enhanced competition in the market." *Associated Gen. Contractors of Cal.*, 459 U.S. at 539 (discussing whether the plaintiff, who "was neither a consumer nor a competitor in the market," suffered an injury "of the type that the antitrust statute was intended to forestall"). Defendants aptly observe that, "as shareholders of [Defendant] Matrix's parent company, Plaintiffs arguably would have benefited

---

[2] Plaintiffs' argument that they remain in the risk adjustment service provider market by virtue of their ownership interest in Defendant Matrix's parent company is incorrect. Plaintiffs voluntarily withdrew from the market when they sold "all outstanding equity interests in HealthFair" to and ceased to compete with Defendant Matrix. (Doc. 1, ¶ 82); *see McDonald v. Johnson & Johnson*, 722 F.2d 1370, 1374 (8th Cir. 1983) (finding that the plaintiff voluntarily withdrew from the transcutaneous electronic nerve stimulator market by selling their company's stock to the defendant and noting that there is an abundance of case law precluding antitrust standing in such situations).

8

from a merger that gave [Defendant] Matrix market power and allowed [it] to charge higher prices, as they allege." (Doc. 42, p. 8).³

More importantly, this injury is not the type of injury that a Section 7 violation is likely to cause, and other remedies exist under corporate law. *See Brunswick*, 429 U.S. at 489. Plaintiffs do not complain about their inability to compete in the risk adjustment service provider market or about the effect of increased prices of risk adjustment services or insurance premiums on them as consumers. Rather, they complain about "benefits they would have otherwise received from their shares." (Doc. 1, ¶ 110); *see Fla. Seed Co. v. Monsanto Co.*, 105 F.3d 1372, 1374–75 (11th Cir. 1997) (noting that "[t]he objective in preventing certain mergers is . . . to prevent [the acquiring party] from obtaining sufficient market power to raise prices" and that Congress only condemns mergers "when they may produce anticompetitive effects" (internal quotation marks omitted)).

For the same reason, Plaintiffs' citation to *Blue Shield of Virginia v. McCready* is unavailing. 457 U.S. 465 (1982). In that case, the plaintiff's group health plan reimbursed subscribers for services provided by psychiatrists, but not for psychologists. *Id.* at 468. The Supreme Court held that the plaintiff had antitrust standing "[a]s a consumer of psychotherapy services entitled to financial

---

3   Plaintiffs argues, in a footnote, that whether Plaintiffs "arguably benefitted" from Defendant Matrix's ability to charge higher prices "is the sort of factual contention that cannot be resolved on a motion to dismiss." (Doc. 49, p. 10 n.7). But the Court's recognition of Defendants' argument does not resolve a factual contention. Rather, the nebulousness of Plaintiffs' alleged injury as stockholders implicates the legal consideration before the Court: whether the Complaint properly pleads an antitrust injury.

9

benefits under the [group health plan]." *Id.* at 479–80. It reasoned: "Denying reimbursement to subscribers for the cost of treatment was the very means by which it is alleged that [the defendant] sought to achieve its illegal ends. The harm to [the plaintiff] and her class was clearly foreseeable; indeed, it was a necessary step in effecting the ends of the alleged illegal conspiracy." *Id.*

Plaintiffs argue that, like *McCready*, their alleged financial injuries are "inextricably intertwined" with the Acquisition's injury to the market. (Doc. 49, p. 6). But *McCready* is not on par with this case. As previously stated, Plaintiffs are not consumers of risk adjustment provider services or competitors in the risk adjustment service provider market. Moreover, there is no alleged conspiracy here, and the alleged suppression of HealthFair's operations is not "the very means" by which Defendants reduce competition. The Acquisition itself achieves that goal, regardless of whether Plaintiffs sustain an injury.

Thus, the Court finds that Plaintiffs' alleged injury is not "of the type" Section 7 was intended to prevent. *See Brunswick*, 429 U.S. at 489. Plaintiffs may have suffered an injury—but, even viewing the Complaint in the light most favorable to Plaintiffs, they have not suffered an *antitrust* injury. Thus, Plaintiffs lack antitrust standing, and dismissal is appropriate.[4]

---

4   Because the Court finds that there is no antitrust injury, there is no need for the Court to evaluate whether Plaintiffs are efficient enforcers or address Defendants' other arguments in favor of dismissal. Additionally, the lack of antitrust injury renders Plaintiffs' request for an injunction under Section 16 of the Clayton Act moot. *Palmyra*, 604 F.3d at 1299.

10

## IV. CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendants' Motion to Dismiss (Doc. 42) is **GRANTED**;

2. The Complaint (Doc. 1) is **DISMISSED WITHOUT PREJUDICE**;

3. On or before June 28, 2021, Plaintiffs may file an Amended Complaint consistent with the directives of this Order, if they believe they can do so in accordance with Rule 11.

**DONE AND ORDERED** in Orlando, Florida on June 14, 2021.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties